NOTICE

Decision filed 08/01/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220126-U

NOS. 5-22-0126, 5-22-0127, 5-22-0137 cons.

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* G.W. and Z.M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 17-JA-4, 17-JA-5 |
| | ) | |
| Freda M. and Gene W., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondents-Appellants). | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's judgments terminating respondent mother and father's parental rights, where the court's findings that respondents were unfit for failing to make reasonable progress were not contrary to the manifest weight of the evidence.

¶ 2    Respondent mother, Freda M., and respondent father, Gene W., appeal the Marion County circuit court's judgments terminating their respective parental rights to G.W. and Z.M. (Gene W. is not the biological father of Z.M.), arguing that the court's findings that they were unfit parents were against the manifest weight of the evidence.[1] For the following reasons, we affirm.

_____

[1]In the circuit court, the State filed separate juvenile petitions for G.W. (Marion County Case No. 17-JA-4) and Z.M. (Marion County Case No. 17-JA-5). Freda M. appealed the circuit court's judgments in both 17-JA-4 and 17-JA-5 (Appeal Nos. 5-22-0126 and 5-22-0127). Gene W. appealed the circuit court's judgment in 17-JA-4 (Appeal No. 5-22-0137). This court subsequently consolidated the three appeals under 5-22-0126.

1

¶ 3                                    I. Background

¶ 4      The circuit court proceedings giving rise to this action spanned over five years and the record on appeal is voluminous. We limit our recitation of the facts to those necessary for an adequate understanding of the case and resolution of the issues on appeal.

¶ 5      On March 3, 2017, the State filed petitions for adjudication of wardship pertaining to G.W. (17-JA-4) and Z.M. (17-JA-5), both minors in the custody of their biological mother, Freda M. (Mother).[2] The petitions named Gene W. (Father), as the biological father of G.W. (born on March 2, 2016), and Steven D., as the biological father of Z.M. (born on February 15, 2017).[3] The petitions alleged both minor children neglected due to an injurious environment in violation of section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act). 705 ILCS 405/2-3(1)(b) (West 2016). In support, the petitions first alleged that Mother was unable to properly care for the children because she suffered from bipolar disorder, did not take medication as directed, and exhibited erratic behavior. Next, the petitions alleged that Mother could not adequately care for the children because her three other children went into protective care, and she failed to cooperate with the Illinois Department of Children and Family Services (DCFS). Lastly, the petitions alleged that the children were in an environment injurious to their welfare, because Mother informed hospital nurses she needed a gun to kill herself on February 21, 2017, shortly after Z.M.'s birth. The petition pertaining to G.W. made no allegations against Father, who resided in Wisconsin.[4]

_____

[2]The record reveals that the Illinois Department of Children and Family Services became involved with Mother after receiving a hotline report on February 17, 2017, which stated that Z.M. was transferred to the Neonatal Intensive Care Unit shortly after birth with diagnoses of respiratory distress and prematurity with a low birth weight, along with a positive urine drug screen for marijuana.

[3]The record reveals that the circuit court found Steven D. unfit in July 2019 and terminated his parental rights in October 2019; however, Steven D. is not a party to the instant appeal.

[4]The State served Father by publication; however, it does not appear from the record that Father participated in the adjudicatory proceedings.

2

¶ 6    On June 28, 2017, the circuit court held an adjudicatory hearing. Mother appeared with appointed counsel, and a guardian *ad litem* (GAL) appeared on behalf of the children. Father did not appear at the hearing. The State indicated that the parties "worked out a resolution in this matter." Mother's attorney stated that Mother admitted the State's allegation that Mother had three other children in protective care in a prior case, and she failed to complete her service plan. Mother's attorney indicated that "all parties would be agreeing to a continuance under supervision for one year in this case." The following colloquy then took place between the court and Mother:

> "THE COURT: All right. So now I have a couple of questions for you, [Mother]. Your attorney just told me that you are going to be admitting paragraph four in the petition. Do you know what paragraph is [*sic*] that is?
> [MOTHER]: Yeah.
> THE COURT: Okay. So you are admitting that, [Mother]?
> [MOTHER]: Yeah.
> THE COURT: And you are agreeing to what we call a continuance under supervision which means we're going to be in your lives for a year. DCFS is going to be ordered to give you services. And you are going to be ordered and you are ordered to cooperate with those services. Do you understand that as well?
> [MOTHER]: That's fine, I understand.
> THE COURT: Okay. And that's your agreement?
> [MOTHER]: That's great with me. I agree."

Following the hearing, the court entered an order granting Mother custody and guardianship of the minor children while under supervision for one year. The court conditioned the order upon Mother cooperating with DCFS and Caritas Family Solutions (Caritas), as well as Mother complying with all requirements of the recommended intact services.

¶ 7    On March 1, 2018, the State filed petitions to revoke continuance under supervision order, along with motions for temporary custody in both cases. The petitions alleged that Mother refused to allow caseworkers to view the children, acted erratically in the presence of caseworkers, made violent threats towards previous caseworkers, and threatened the GAL's life. The petitions further alleged that Mother failed to complete recommended services. The motions for temporary custody

alleged, *inter alia*, that it was a matter of immediate and urgent necessity for the protection of the children that they be placed in shelter care.

¶ 8    At a status hearing held on March 7, 2018, Mother appeared with counsel. Father did not appear at the hearing. The GAL requested that the circuit court proceed on the motion for temporary custody and treat the proceeding as an emergency shelter care hearing. The court granted the GAL's request over the objection of Mother's attorney. The court heard testimony from four witnesses: Michael Turner, a Caritas caseworker from Belleville, Illinois; Cortney Toennis, a Caritas caseworker from Mt. Vernon, Illinois; Stephanie Perez, a Caritas case supervisor; and Mother. After considering the testimony and recommendation of the GAL, the court found probable cause that the children were neglected and entered orders granting DCFS temporary custody and guardianship of the minor children.

¶ 9    On March 14, 2018, the State filed amended petitions to revoke continuance under supervision order in both cases. The petitions repeated the original allegations but added that, after the circuit court entered the temporary custody orders, Mother both refused to relinquish the children to the custody of DCFS and concealed the whereabouts of the children. The petitions further alleged that Mother repeatedly telephoned Caritas after hours with violent threats towards the agency and accusations that the agency kidnapped her children.

¶ 10    On April 25, 2018, the circuit court held a hearing on the State's amended petitions to revoke. At the hearing, the court heard testimony from five witnesses: Michelle Massey, a foster care supervisor; Turner; Toennis; Perez; and Mother. The testimony generally established that Mother did not consistently attend mental health counseling. The testimony also established that Mother awaited approval for a psychological evaluation, although Mother indicated that she would neither attend a psychiatric evaluation nor take prescribed medications. Perez testified that Mother

4

made multiple, violent threats against Caritas and Caritas caseworkers following the removal of the children. Contrary to the caseworkers' testimonies, Mother testified that she attended her mental health counseling appointments and was willing to take prescribed medications. After considering the testimony, the circuit court revoked the continuance under supervision orders. In doing so, the court noted that Mother failed to regularly attend mental health counseling and that Mother's erratic, threatening behavior raised concerns regarding Mother's conduct around the children. The court directed Mother to comply with the service plan and directed Caritas to consider Mother's mental illness and history with DCFS.

¶ 11 On May 21, 2018, the State filed motions to enter adjudicatory orders *nunc pro tunc*. The motions alleged that, on June 28, 2017, Mother admitted the State's allegation that she could not adequately care for the children, because she had three other children in foster care and failed to cooperate with DCFS. Thereafter, the circuit court entered adjudicatory orders finding the children abused or neglected in that the children were in an environment injurious to their welfare as defined by section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2018)).

¶ 12 On May 22, 2018, Kendra Schuler, a Caritas caseworker, filed a report with the circuit court. In the report, Schuler noted that Mother "no call no showed" for five scheduled mental health counseling appointments, and that she was not taking prescribed medications. Schuler also indicated that Mother maintained a residence in rent-assisted public housing and obtained a job but quit shortly thereafter. Regarding Father, Schuler noted that Father contacted her and expressed willingness to cooperate with Caritas to obtain custody of G.W. Schuler noted that Father agreed to attend the next court hearing, complete a DNA test, and complete an integrated assessment. Schuler further noted that Father kept G.W. with him in Wisconsin for several weeks but returned G.W. to Mother at Mother's request, and that Father began paying Mother child support shortly

thereafter. Schuler advised Father that, if Mother was unable to regain custody of G.W., he, as the "non offending" parent, could take custody. Schuler advised Father that she could not place G.W. with Father unless he went through "the interstate compact process."

¶ 13    On May 23, 2018, the circuit court held a dispositional hearing. Following the hearing, the court entered a dispositional order finding it consistent with the health, welfare, and safety of the minor children to be made wards of the court. The court ordered Mother and Father to comply with the service plans, and that guardianship of the minor children be placed with the guardianship administrator of DCFS. DCFS subsequently placed both children with foster parents.

¶ 14    On October 12, 2018, Schuler filed a permanency report with the circuit court. Schuler noted that Father maintained contact with her and expressed willingness to comply with Schuler's requests to establish a relationship with G.W. The report further indicated that Mother made some progress towards her service plan by undergoing a psychological evaluation but that she missed half of her scheduled mental health counseling sessions. Following a hearing held on October 17, 2018, the circuit court entered a permanency order setting the goal as return home within 12 months. The court also entered an order requiring Father to submit to DNA testing.

¶ 15    On January 11, 2019, Schuler filed a report with the circuit court. The report indicated that Father maintained contact with Schuler and that Schuler received proof of Father's paternity of G.W. on January 9, 2019. Schuler noted that, as a result, Father could begin monthly visits with G.W. Schuler further noted that Father completed an integrated assessment and expressed willingness to take custody of G.W. if permitted.

¶ 16    At a permanency hearing held on January 16, 2019, Schuler informed the circuit court that she only offered Father visitation with G.W. after confirming his paternity. She offered Father visitation with G.W. after the hearing, but he advised her that he could not miss work on that date.

6

Schuler stated that she advised Father to travel to Illinois for monthly visits with G.W. Schuler agreed she could set up phone or Skype visitations between Father and G.W. but had not done so. Following the hearing, the court entered a permanency order finding that neither Mother nor Father made substantial progress towards the return home of the children. The court again set a permanency goal of return home within 12 months.

¶ 17     On March 15, 2019, the State filed petitions to terminate Mother and Father's respective parental rights to G.W. and Z.M. The State alleged that Mother was unfit on four grounds under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). Specifically, the State alleged that Mother was an unfit person on the following grounds: (1) she failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children (*id*. § 1(D)(b)); (2) she failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor children from her during any nine-month period following the adjudication of neglected or abused minors under section 2-3 of the Juvenile Court Act, specifically between May 24, 2018, and February 23, 2019 (*id*. § 1(D)(m)(i)); (3) she failed to make reasonable progress toward the return of the minor children during any nine-month period following the adjudication of neglected or abused minors under section 2-3 of the Act, specifically between May 24, 2018, to February 23, 2019 (*id*. § 1(D)(m)(ii)); and (4) she was unable to discharge parental responsibility, as supported by competent evidence from a clinical psychologist of mental impairment, mental illness, or intellectual disability as defined in section 1-116 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-116 (West 2018)), and there was sufficient justification to believe that the inability to discharge parental responsibilities would extend beyond a reasonable time period (750 ILCS 50/1(D)(p) (West 2018)). The State alleged that Father was unfit on the following three grounds: (1) he abandoned the minor child (*id*. § 1(D)(a)); (2) he failed

7

to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor child (*id.* § 1(D)(b)); and (3) he deserted the minor child for the three preceding months or more (*id*. § 1(D)(c)).

¶ 18    On April 24, 2019, the circuit court held a status hearing where Mother appeared with counsel. Father made his first appearance at the hearing and received the previously filed petition to terminate his parental rights to G.W. After the court reviewed the allegations in the petitions, the court appointed counsel for Father. Following the hearing, the court entered a permanency order changing the goal to substitute care pending determination of the termination petition.

¶ 19    On July 17, 2019, the circuit court held a fitness hearing. Both Mother and Father appeared at the hearing with counsel. After considering the evidence presented, the court granted Father's motion for directed verdict on all three grounds of unfitness alleged in the termination petition. The court also granted Mother's motion for directed verdict on two of the four grounds alleged in the petitions, finding that the State failed to provide evidence in support of the allegations that Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children and that she was unable to discharge her parental responsibilities due to mental illness. With regard to the remaining two grounds, the court found the State failed to meet its evidentiary burden of proving that Mother failed to make reasonable efforts or reasonable progress from May 24, 2018, and February 23, 2019. Thus, the court denied the State's petitions to terminate Mother and Father's parental rights and set the permanency goal to return home within 12 months.

¶ 20    On October 23, 2019, Schuler filed a family service plan with the circuit court. The service plan, dated July 22, 2019, summarized Mother's progress as follows:

8

"Over the last six months [Mother] has shown a distinct lack of ability to care for herself much less any children that could be placed with her. She has not consistently participated in mental health services, has been psychiatrically hospitalized due to suicidal ideation, has displayed erratic behaviors during her visitation, has shown erratic behavior in the general public, believes that she has health conditions that test results that [*sic*] show that she does not, has no means to support herself financially, lives in a home that has no electricity and, based upon information given to worker, sees eviction from that home as eminent. [Mother] has indicated to worker that she is going to be moving to Wisconsin and wanted the court to complete an interstate compact with her."

With regard to Mother's mental health, Schuler specifically noted that Mother attended no mental health counseling sessions since April 2019 and refused medication, despite being hospitalized for suicidal thoughts in July 2019. Schuler also noted that Mother failed to participate in domestic violence counseling, despite her involvement in a domestic violence incident with Steven D. earlier in the year. As a result, Schuler rated Mother's progress as unsatisfactory.

¶ 21    With regard to Father, Schuler noted that she scheduled four visits between G.W. and Father but Father attended only two visits in February and April 2019. Schuler also noted that Father failed to provide documentation showing that he completed domestic violence and anger management courses "in relation to a domestic violence incident that occurred between he and [Mother]," which resulted in Father's arrest. Lastly, Schuler noted that Father failed to complete a parenting course. As a result, Schuler rated Father's progress unsatisfactory.

¶ 22    On May 22, 2020, Schuler filed a family service plan with the circuit court. The service plan, dated February 11, 2020, summarized Mother's progress as follows:

"Over the last six months [Mother] has made a few positive choices, however, over all there is not progress towards returning the children home to [Mother]. She has not consistently participated in mental health services, has displayed some inappropriate behaviors during her visitation, has shown erratic behavior in the general public, has not had appropriate housing for the majority of the 6 months, and has been arrested once for criminal trespass and involved in 4 domestic disturbances at different homes."

With regard to Mother's mental health, Schuler noted that Mother began taking prescribed medication but failed to attend 11 of the 15 scheduled mental health counseling sessions in the preceding six months. Schuler noted that the service provider discharged Mother on August 23, 2019, due to noncompliance. Schuler further noted that Mother began counseling services again on September 5, 2019, but was discharged unsuccessfully on February 10, 2020, after missing two scheduled sessions in a row. Schuler noted that she assisted Mother in obtaining an apartment after Mother obtained a job, but that Mother had since lost the job and was unable to pay rent. As a result, Schuler rated Mother's progress towards her service plans as unsatisfactory.

¶ 23    With regard to Father, Schuler noted that he made little progress towards his service plan in the preceding six months. Schuler noted that Father maintained stable housing and employment but failed to enroll in domestic violence and anger management courses. Father submitted documentation that he began a parenting course but provided no documentation showing he completed the course. Despite Schuler's recommendation that Father engage in monthly visits with G.W., he attended only two of the six scheduled visits. Specifically, Father appeared for a visit in August 2019 but missed visits in September, October, November, and December 2019. Schuler noted that Father attended a visit in January 2020 but was late. As a result, Schuler rated Father's progress towards his service plan as unsatisfactory.

10

¶ 24    On June 30, 2020, the State filed petitions for termination of parental rights and for appointment of guardian with power to consent to adoption of G.W. and Z.M. The State alleged that Mother was an unfit person as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) on the following four grounds: (1) she failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children (*id*. § 1(D)(b)); (2) she failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor children from her during any nine-month period following the adjudication of neglected or abused minors under section 2-3 of the Juvenile Court Act, specifically between September 20, 2019, and June 20, 2020 (*id*. § 1(D)(m)(i)); (3) she failed to make reasonable progress toward the return of the minor children during any nine-month period following the adjudication of neglected or abused minors under section 2-3 of the Act, specifically between September 20, 2019, to June 20, 2020 (*id*. § 1(D)(m)(ii)); and (4) she was unable to discharge parental responsibility, as supported by competent evidence from a clinical psychologist of mental impairment, mental illness, or intellectual disability as defined in section 1-116 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-116 (West 2020)), and there was sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period (750 ILCS 50/1(D)(p)).

¶ 25    The State alleged that Father was an unfit person as defined by section 1(D) of the Adoption Act (*id*. § 1(D)) on the following five grounds: (1) he abandoned the minor child (*id*. § 1(D)(a)); (2) he failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor child (*id*. § 1(D)(b)); (3) he deserted the minor child for the three preceding months or more (*id*. § 1(D)(c)); (4) he failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child during any nine-month period following the adjudication of

11

neglected or abused minors under section 2-3 of the Act, specifically between September 20, 2019, to June 20, 2020 (*id*. § 1(D)(m)(i)); and (5) he failed to make reasonable progress toward the return of the minor child during any nine-month period following the adjudication of neglected or abused minors under section 2-3 of the Act, specifically between September 20, 2019, and June 20, 2020 (*id*. § 1(D)(m)(ii)). Lastly, the State alleged that it was in the best interest of the children that all parental rights of Mother and Father be permanently terminated, that the children be placed in the guardianship of DCFS, and that guardianship administrator for DCFS be given the power to consent to the adoption of the children.

¶ 26   On July 1, 2020, the circuit court held a permanency hearing via Zoom. Both Mother and Father appeared at the hearing. Following the hearing, the court changed the permanency goal to substitute care pending determination of the State's petition to terminate parental rights.

¶ 27   On October 20, 2020, Schuler filed a family service plan with the circuit court. The service plan, dated August 7, 2020, indicated that Mother did not consistently participate in mental health services. Schuler noted that Mother continued to display erratic behavior in public and during visits with the children. Schuler also noted that police responded to a domestic violence incident at Mother's home in February 2020, and that police responded to two incidents at Mother's home involving a registered sex offender in May 2020. Schuler noted that Mother currently resided in an apartment but was four months behind on rent. Schuler further noted that Mother did not have stable employment, which raised concerns regarding Mother's ability to pay utility bills. Schuler indicated that Mother displayed both appropriate and inappropriate behavior during visits with the children. Schuler also indicated that Mother did not engage in consistent visitation with the children, explaining the Mother missed several visits due to illness or simply "not calling in." As a result, Schuler rated Mother's progress towards her service plan as unsatisfactory.

12

¶ 28    With regard to Father, Schuler noted that Father maintained stable housing and employment but otherwise made no significant progress towards his service plan over the preceding six months. Father did not complete domestic violence, anger management, or parenting courses, as previously recommended. Schuler noted that Father appeared for an in-person visit with G.W. while ill, and that he impressed Schuler "with how he engaged with his daughter" despite having an illness. Schuler noted that Father was unable to appear for in-person visits with G.W. from March through July 2020 due to the COVID-19 pandemic, but that he appeared for Zoom visits with G.W. during that time. Father missed several Zoom visits due to his grandmother passing away, and he missed rescheduled visits without contacting Schuler. Schuler noted that she did not submit an interstate compact request, "as it would most likely be denied due to his unsatisfactory service plan." Schuler rated Father's progress towards the service plan as unsatisfactory.

¶ 29    In December 2020, prior to hearings on the State's petition to terminate parental rights, the circuit court suspended Mother's visitation with the children due to her combative conduct and the negative effects the visits had on the children. The court also ordered that the permanency goal remain substitute care pending termination and set the matter for a fitness hearing on March 17, 2021.

¶ 30    The circuit court held a three-day fitness hearing on March 17, June 2, and September 8, 2021. At the hearing on March 17, 2021, neither Mother nor Father attended, but their respective attorneys appeared at the hearing. Mother's attorney moved to continue the hearing, indicating that he did not know why Mother was not present at the hearing. The court denied the motion to continue. The court allowed Father to appear via Zoom without objection from any party.

13

¶ 31    The State called its first witness, Dr. Rachel Tompkins, a licensed clinical psychologist. Dr. Tompkins testified that she conducted a psychological evaluation of Mother upon referral from DCFS on August 14, 2018, and prepared a report setting forth her findings and opinions on September 10, 2018. Following the evaluation, Dr. Tompkins concluded that Mother suffered from post-traumatic stress disorder (PTSD), delusional disorder, and mixed personality disorder. Dr. Tompkins could not conclude with certainty that Mother suffered from bipolar disorder. Dr. Tompkins explained that bipolar disorder would respond to medication, while PTSD would not respond to medication. While Dr. Tompkins declined to use the term "mental illness" when referring to Mother's conditions, Dr. Tompkins agreed that Mother's PTSD substantially impaired her thought, perception of reality, emotional process, judgment, behavior, and ability to cope with the ordinary demands of life. Dr. Tompkins testified that Mother's PTSD stemmed from childhood abuse and trauma, much of which occurred while Mother was placed in foster homes by DCFS. Dr. Tompkins also noted that Father "was abusive to [Mother] and tried to rape her." Dr. Tompkins opined that Mother's PTSD negatively affected her parenting, and that Mother could not discharge her parental responsibilities at the time of the evaluation. However, Dr. Tompkins hoped that Mother could change with certain types of services, including dialectic behavior therapy (DBT) and trauma specific therapy.

¶ 32    In Dr. Tompkins's opinion, DCFS employees telling Mother "what to do" triggered Mother's PTSD. Dr. Tompkins compared Mother's relationship with DCFS as to that of a parent and child when the parent "failed to protect and then tried to tell them what to do." In Dr. Tompkins's opinion, the best approach for Mother "would be, instead of insisting, to explain the mental health services which [were] available—and make them available." Dr. Tompkins

14

explained that Mother would be more likely to engage in services if she could choose her own provider and timeline with explicit instruction from a caseworker.

¶ 33    The State next called Dr. Martha Bidiuc, a psychiatrist at St. Mary's Hospital in Centralia, Illinois. Dr. Bidiuc testified that she treated Mother from July 12, 2019, to July 15, 2019, after Mother telephoned police and requested transportation to the hospital because she was having suicidal thoughts. After conducting a psychiatric evaluation, Dr. Bidiuc opined that Mother suffered from major depressive disorder, PTSD, and borderline personality disorder. Dr. Bidiuc strongly encouraged Mother to take prescribed medication, but Mother declined. Dr. Bidiuc observed Mother "having an explosive episode of anger" on July 14, 2019, explaining that Mother's mood "switched fast." Mother again declined prescribed medications following the explosive episode, despite encouragement from various treatment providers. Mother agreed she had an anger problem and a violent past, so she expressed willingness to participate in counseling. Dr. Bidiuc testified that Mother was discharged from care on July 15, 2019, but that Mother's treatment team obtained an appointment for Mother at the Community Resource Center (CRC) on July 16, 2019.

¶ 34    The State next called John Hinkel, the police officer who transported Mother to St. Mary's Hospital on July 11, 2019. Officer Hinkel testified that he responded to a call regarding a suicidal female on July 11, 2019. When he arrived at the scene, Mother advised "that she was upset and having some trouble dealing with some personal issues and that she felt like harming herself." Officer Hinkel became worried that Mother would hurt herself, so he transported her to St. Mary's Hospital. Officer Hinkel signed a petition for admission to the psychiatric unit because Mother advised him that she was going to kill herself.

¶ 35    After Officer Hinkel testified, the following exchange took place:

15

"[MOTHER'S ATTORNEY]: I could wait until directed finding. But I'll go ahead and make a motion at this point to dismiss paragraph 9(D) of the State's petition about saying that [Mother] is unable to discharge parental responsibilities, which is supported by competent evidence from a licensed clinical psychologist of mental impairment and so forth. Because I believe that's what the State is attempting to do with many of these witnesses.

I will note that issue was previously litigated in the termination petition in 2019 when a directed verdict regarding that exact same allegation was granted. So I believe based upon *res judicata*, we would argue that the court record of such allegations should be dismissed.

THE COURT: [The State]?

[THE STATE]: Your Honor, the State's position would be at the time—[Mother's attorney] is right. This issue was litigated in July of 2019. There was no evidence presented in July of 2019 of a—from a clinical psychologist. And directed verdict was granted.

However, that paragraph is not just related to whether there's a mental illness. But also the ability to discharge parental responsibilities into the future. And the State's position is that *res judicata* would not prevent us from bringing this issue up in the future.

Essentially, [Mother] got a second chance. The Court heard the evidence and felt that there wasn't sufficient testimony that she had a mental illness. But I don't believe that it should be barred at this procedure or this juncture."

After considering the arguments, the circuit court denied the motion for directed verdict.

¶ 36    The State next called Blake Byers, a mental health and substance abuse therapist from the CRC. Byers testified that he counseled Mother on five occasions from January 1, 2020, until her discharge for noncompliance in May or June 2020. Byers explained that the CRC discharged Mother because she failed to attend services and appear for scheduled appointments. Byers testified that, based upon the last two meetings he had with Mother, he believed Mother expressed willingness to make some progress. Despite this, Mother was discharged because she stopped coming to treatment.

¶ 37    The State's final witness on March 17, 2021, was Rebeccah McConnaughay, a case assistant employed by Caritas. McConnaughay testified that she observed most of the visits between Mother and the children from September 2019 to June 2020. McConnaughay became concerned with Mother's parenting skills after observing the visits. Mother repeatedly made negative comments about the children's appearances and the children's foster parents in front of

16

the children. McConnaughay explained that many of the in-person visits took place at the Centralia Library or public park because the case supervisor did not allow visits at Mother's home. McConnaughay's testimony generally established that Mother missed over half of the 30 scheduled visits from September 2019 to June 2020. Mother did not appear for any of the four scheduled visits in November 2019, which upset the children.

¶ 38   McConnaughay testified that Mother did not appear for another visit with the children until December 13, 2019, missing the first scheduled visit in December 2019. Mother brought the children gifts at a visit on December 27, 2019. During the visit, Mother caused the children distress by expressing dislike for the boots their foster parents got them for Christmas. Mother appeared for three visits in January 2020, but she canceled two scheduled visits due to rain and illness. McConnaughay explained that Mother did not have any visits with the children in March 2020 due to Mother failing to confirm one visit, the COVID-19 pandemic, and Mother not having the ability appear via Zoom. Mother missed two additional visits in April 2020 due to technical difficulties and illness but appeared via Zoom for one visit. During the April Zoom visit, Mother became upset because the children referred to their foster parent as "mom." Mother again became upset when the children referred to their foster parent as mom during a visit on May 1, 2020, which resulted in McConnaughay ending the visit early. McConnaughay canceled the next visit scheduled for May 8, 2020, due to threats made by Mother, and Mother did not appear for the next two visits scheduled for May 15 and May 22, 2020. Mother appeared for visits on May 29 and June 5, 2020, but did not appear for visits on June 12 and June 19, 2020. Mother upset the girls during visits by telling them that they would be coming to live with Mother at her home.

¶ 39   McConnaughay testified that she observed a "good" Zoom visit between G.W. and Father on May 28, 2020. During the visit, Father complimented G.W.'s hair and appearance. Father and

17

G.W. talked and giggled together. Father advised that he sent G.W. a doll. G.W. indicated that she wanted to end the visit 5 to 10 minutes early to play outside and Father obliged without forcing G.W. to stay on the visit. McConnaughay testified that Father missed a Zoom visit scheduled for June 18, 2020.

¶ 40 At the hearing on June 2, 2021, Mother appeared with counsel. Father's attorney appeared in person at the hearing and Father appeared via Zoom. The State called three witnesses: Dala Wingo, a Caritas case assistant; Cierra Bell, a Caritas case assistant; and Schuler. Wingo testified that she observed a visit between Mother and the children on February 28, 2020, where Mother made various inappropriate comments that negatively impacted the children. Bell testified that she, along with McConnaughay, observed a Zoom visit between Mother and the children on May 1, 2020, where Mother cussed, yelled, and made inappropriate comments towards the children's foster parent in front of the children.

¶ 41 Schuler testified that she became the children's foster care caseworker in April 2018 and remained the caseworker at the time of the hearing. Schuler testified that she first met Mother during a home visit in March 2018. During the visit, Mother made inappropriate comments, restated threats against the prior workers involved in the case, and displayed erratic behavior. Schuler became concerned with how quickly Mother drastically "deescalated" and became "euphoric" after displaying anger. Shortly after this visit, Schuler's supervisor reassigned the case to Schuler after determining that Caritas needed "somebody with more experience on the case."

¶ 42 Schuler testified that she established service plans for Mother every six months. Schuler noted that Mother had DCFS involvement in her life for 11 years, beginning when she had her first child at age 16. Schuler explained that every time Mother had a new child or children were taken into custody, DCFS performed an integrated assessment and formed a plan based upon the

18

integrated assessment. According to Schuler, "many of the services that [Mother] was asked to do she's been asked to do since 2017 and beyond in the previous 22 service plans that she's had to date." With regard to G.W. and Z.M., Schuler testified that she generated service plans for Mother dated July 22, 2019 (filed October 23, 2019), February 11, 2020 (filed May 22, 2020), and August 7, 2020 (filed October 20, 2020). The circuit court took judicial notice of the service plans under the caveat that it would consider those plans only for the recommended services and the rating for each service.

¶ 43    Schuler testified that she generated the July 22, 2019, service plan after the first termination proceeding. Schuler explained that Mother received unsatisfactory ratings on "most everything" except for undergoing substance abuse counseling, submitting to drug testing, and not allowing any corporal punishment towards her children. According to Schuler, Mother was incarcerated on the date of the termination hearing and remained incarcerated until August 6, 2019. The court took judicial notice of a traffic ticket (2018-TR-312) Mother received for leaving the scene of an accident, which resulted in Mother serving a 14-day jail sentence. Schuler met Mother at the jail for a child and family team meeting. Schuler advised Mother she had another chance to get her children back but needed to comply with the requirements of the service plan, including the requirements that she obtain stable housing, obtain a job, attend parenting courses with a parenting coach, engage in mental health counseling, and take any prescribed medications. Mother expressed a willingness to comply with the requirements.

¶ 44    Schuler testified that she learned Mother's landlord evicted Mother from her house in August 2019. Schuler was unable to locate Mother until September 2019, at which time Mother was living with her aunt. Mother lived with her aunt for a month and then began living with a boyfriend until their relationship ended. In December 2019, Mother requested that Schuler assist

Mother in finding an apartment and employment. After Mother began working at a factory, Schuler accessed funding for Mother to assist in paying rent and bills. Mother later refused to inform Schuler about who lived with her at the apartment, but Schuler learned of several domestic disturbance incidents involving Mother's boyfriend from police reports. Schuler found this concerning because Mother had a history of relationships involving domestic violence, including her relationships with Father and Steven D. Schuler claimed that Mother stopped paying rent on the apartment in February 2020. After that time, Schuler assisted the landlord in obtaining funding through a pandemic relief fund, so the landlord could be paid for some of Mother's owed rent.

¶ 45    Schuler testified that the service plan required Mother to obtain mental health treatment. In Schuler's opinion, Mother's participation in mental health counseling was unsatisfactory at the time of the hearing. Schuler explained that Mother attended counseling for short time periods but would "get dropped" after she stopped attending counseling sessions. Schuler stated that Mother's mental health counselor "dropped" Mother for missing sessions shortly after Schuler assisted Mother in obtaining an apartment in January 2020. Schuler claimed, however, that Mother reengaged in counseling sessions on February 23, 2020. Mother continued attending counseling sessions via Zoom until May 25, 2020. Mother also briefly took medication in January 2020 but stopped taking the medication.

¶ 46    Schuler testified that Mother also inconsistently attended visits with her children, advising caseworkers that she was working, sick, or did not "feel like she could deal with seeing the [children] that day or something to that effect." According to Schuler, Caritas offered Mother over 30 visits with her children and Mother missed 19 of the visits from September 20, 2019, to June 20, 2020. Schuler noted that when Mother did attend the visits, she made comments that negatively affected the children.

20

¶ 47    Schuler next testified regarding the services recommended for Father. Schuler began speaking with Father in April 2018 but first met Father in February 2019. Schuler explained that Father contacted her regarding G.W., because Mother failed to indicate that Father was G.W.'s biological father. After confirming Father's paternity, Schuler created a service plan for Father. In addition to recommending that Father participate in parenting courses, Schuler recommended that Father participate in domestic violence and anger management courses due to his prior violence towards Mother. Schuler also recommended that Father cooperate with interstate compact, which required him to maintain stable employment, maintain stable housing, and complete all necessary paperwork. Schuler additionally recommended that Father visit G.W. at least once each month. Schuler reviewed the recommended goals and tasks with Father via telephone.

¶ 48    With regard to Father's progress on the recommended services, Schuler testified that Father never produced documentation that he completed domestic violence and anger management courses. Schuler claimed that "[t]he only thing that he was satisfactory on the service plans was that he did not spank—he did not offer any corporal punishment during his visitations." Schuler added "that he was also satisfactory in offering only time-out or redirection as part of discipline during [visitations]," although she noted that Father never had any reason to put G.W. in time-out during visits.

¶ 49    Schuler testified that she attended a family team meeting with Father on July 17, 2019. During the meeting, Schuler emphasized the importance of Father's completion of all recommended services and recommendations. Schuler testified that, despite this, Father failed to complete any of the recommended courses, including domestic violence, anger management, and parenting courses, from July 2019 to August 2020. Schuler noted that Father began attending recommended courses in August 2020. Schuler testified that she did not assist Father with travel

expenses from Wisconsin to Illinois for visits because he never indicated a need until July 2020. Schuler noted that Father attended six in-person visits with G.W. from January 2019 to July 2020, which totaled 22.5 hours. Schuler acknowledged that Father appeared for Zoom visits during the COVID-19 pandemic. According to Schuler, G.W. expressed sadness when Father missed several in-person visits without explanation. Schuler believed that Father was very irresponsible and lacked the ability to "plan things." Father always blamed someone else when he was unable to attend visits. Schuler never "set up documents" for interstate compact because Father failed to receive a satisfactory rating on his service plan for a six-month period. Schuler explained that if she had submitted the required documents, Father's request would have been rejected due to his noncompliance with the service plans and he would not have been able to request interstate compact for five years.

¶ 50 When asked if there was anything else Schuler felt was important related to her assistance in this case in relation to Mother and Father, Schuler responded:

"With [Father], I do not say anything, or even with [Mother], I do not say the things that I am saying. I'm taking them from a point of professional standpoint and not from anything personal. [Father] is a very nice guy, and I really hate it for him that he did not engage in services and did not do these things before the goal changed back to substitute care pending the Court's determination of termination of parental rights. I really would have liked for him to have had a shot.

But, at the end of the day, I can't make my parents, either [Mother] or [Father], do the services that they need to do to be able to get their children back. And with [Father], he just did not deliver. While he says that he loves her, and I'm sure he does, he did not put

forth the effort that's required or to make me feel comfortable or confident in his ability to try to get her."

¶ 51   On cross-examination, Schuler testified that she marked Mother satisfactory on drug testing because drug testing was unavailable during the COVID-19 pandemic, and because no one from the agency was allowed to transport Mother for testing. Schuler agreed that Mother never physically harmed the children during visits. Schuler acknowledged that Dr. Tompkins recommended that caseworkers focus on Mother's parenting issues rather than Mother's mental health issues. Schuler admitted that she was aware Mother's parenting coach, Lashanda Webb, went through "a rough patch" but was unaware Webb went to prison. Schuler testified that Webb attended approximately eight visits where she offered Mother parenting advice. Schuler did not attempt to obtain a new parenting coach because Mother seemed comfortable with Webb. When questioned by the GAL, Schuler testified that she rated both Mother and Father's progress as unsatisfactory on the July 22, 2019, February 11, 2020, and August 7, 2020, service plans.

¶ 52   At the fitness hearing held on September 8, 2021, the circuit court heard testimony from four witnesses: Perez, Mother, Webb, and Father. Perez testified that she prohibited caseworkers from transporting Mother for services due to safety concerns after Schuler drove Mother to the psychological evaluation. Perez claimed that Mother made violent threats towards Caritas workers throughout the case. On cross-examination, Perez acknowledged that Dr. Tompkins noted Mother lashed out at times but would not "actually act on that." Perez also testified that she was familiar with Mother's background, including her history of placement in foster homes and trauma.

¶ 53   Next, Mother testified on her own behalf. At the time of the hearing, Mother lived with her brother in an apartment located in Springfield, Illinois, where she worked at a factory earning $500 per week. Mother indicated that she planned to change jobs shortly after the hearing. When asked

23

if she currently participated in any form of counseling services, Mother explained that she previously went to counseling but felt that counseling became more "like a negative" demand after Caritas became involved in the case. Mother felt as though she had no control over her own life when Caritas became involved in the case. Mother denied making any threats towards caseworkers and Caritas.

¶ 54 Mother next testified regarding her parenting coach and aunt, Webb. Mother claimed to have a good relationship with Webb. Webb came to most of the visits but was unable to stay for all visits. Webb's involvement improved Mother's communication with Caritas. Mother testified that it was difficult to turn her children over to DCFS because she herself had been through the "crooked" system. Mother claimed she "had it rough" as a foster child and suffered trauma, so it was difficult to place her children in the same system.

¶ 55 On cross-examination, Mother testified that she had control over her actions throughout the case, including attending visits, attending mental health counseling, maintaining contact with Caritas, and allowing Caritas into her home. When asked if she had control over allowing Caritas into her apartment and advising Caritas of who lived with her, Mother responded, "It's no ones business who lives with me, but yes."

¶ 56 Webb then testified as a witness on Mother's behalf. Webb observed Mother's early childhood and used to provide childcare for Mother. Webb agreed to become Mother's parenting coach several months after the children were taken into protective custody. Webb claimed that Mother did "the best that she could" with her children and that Mother cared "a great deal" for her children. Webb agreed that Mother could have improved certain parenting skills and that Mother heeded her advice on certain issues. Webb claimed that Mother "could be the parent she wanted to be if she had help," including parenting classes.

¶ 57　On cross-examination, Webb agreed that Mother refused to work with Webb as her parenting coach at times. Webb recalled that she woke up Mother for a visit with her children on one occasion and also advised Schuler that Mother should not care for her children; however, Webb claimed that she made this statement following Mother's initial visits with the children.

¶ 58　Next, Father testified on his own behalf. At the time of the hearing, Father resided in Wisconsin, where he worked as a security guard. After Mother moved to Southern Illinois with G.W. shortly after G.W.'s birth, Father only contacted Mother and G.W. through Facebook. Mother's brother contacted Father in February 2017 and advised Father to take G.W. because Mother was having another baby. G.W. then briefly lived with Father at his home in Wisconsin. Mother called to check on G.W. every day and Father eventually brought G.W. back when Mother accused him of kidnapping G.W. Father later agreed to pay child support after a parentage action was initiated against him. Father loved G.W. and desired to be a part of G.W.'s life, so he had no issue providing financial support for G.W. Father maintained contact with the caseworker and eventually completed parenting courses. Father claimed that he would be terminated from his employment if he missed work for certain scheduled visits. He claimed he would do anything he needed to do on G.W.'s behalf.

¶ 59　On cross-examination, Father testified that he made no child support payments since January 2021. Father agreed that he was able to coordinate with Caritas to schedule visits with G.W. to accommodate his work schedule. Despite this, Father only visited G.W. six times in person between August 2019 and February 2020. Father also agreed that he missed four Zoom visits with G.W. in June 2020. When questioned by the GAL, Father admitted that he only recently completed the parenting course.

25

¶ 60     On re-direct, Father testified that he was unable to make the support payments because he switched jobs. Father claimed that Caritas recently provided him with financial assistance to travel to Southern Illinois but provided no financial assistance throughout most the case. Father also explained that the shutdown resulting from the COVID-19 pandemic made it difficult for him to attend scheduled visits. Father further explained that his grandmother, who raised him, died in June 2020 but suffered from health issues in the preceding months. When his grandmother began suffering from health issues, he assisted in caring for his grandmother and father. Father advised the caseworker about the situation with his grandmother and father.

¶ 61     On October 14, 2021, the circuit court entered orders finding Mother an unfit parent for both G.W. and Z.M. on three grounds alleged in the petition.[5] First, the court found that the State met its burden of proving that Mother suffered from a mental impairment or illness which resulted in Mother's inability to discharge her parental responsibilities. In so finding, the court noted that Mother loved her children and that "Mother's behaviors and disabilities [were] a direct result of the victimization she endured while she was in foster care." Despite this, the court found that Dr. Tompkins's testimony demonstrated that "without a specific and consistent course of treatment, Mother will not have the ability to recover and manage her PTSD symptoms." The court further found that over the course of the last several years, Mother demonstrated either unwillingness or inability to engage in the recommended treatment. Thus, the court determined that there was "sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period, as evidenced by the duration of time Mother's inability to parent has lasted during [and] throughout this case."

---

[5]The circuit court found that the State failed to prove the allegation that Mother failed to maintain a reasonable degree of interest, concern, or responsibility.

¶ 62    Next, the circuit court found that the State met its burden of proving both that Mother failed to make reasonable progress towards the goal of reunification and failed to make reasonable efforts to correct the reasons for the removal of the minor children. In support, the court found that Mother did not engage in the recommended course of treatment set forth in her service plan, which could have helped her regain custody of her children. Specifically, the court noted that Mother inconsistently attended counseling and even refused some services. The court further found that Mother was unable "to demonstrate behavior during visits which would be indicative of behavior change and recovery from trauma," and that "Mother's behavior at visits sometimes traumatized her young children, the effects of which lasted for several days after the visit." The court additionally noted that Mother received unsatisfactory ratings in the service plans relevant to the nine-month time period alleged in the petition to terminate (September 20, 2019, to June 20, 2020). Thus, the court found that the State proved by clear and convincing evidence that Mother failed to make reasonable progress towards reunification and failed to make reasonable efforts to correct the reasons for the children's removal. Consequently, the court found the State proved Mother unfit.

¶ 63    Next, the circuit court found that Father was an unfit parent for G.W. on two grounds alleged in the petition.[6] First, the court found that the State met its burden of proving that Father failed to make reasonable progress towards reunification. In support, the court noted that, although Father was not the custodial parent of G.W. at the time the minor was placed into foster care, "DCFS determined that services were necessary to address other issues that pre-dated and post-dated [G.W.'s] removal." The court found that Father did not enroll in domestic violence

_____

[6]The circuit court found that the State failed to prove Father failed to make reasonable efforts because he was not the custodial parent at the time of the removal. The court also found that the State failed to prove Father abandoned G.W. The court did not specifically address the State's allegation of desertion.

27

counseling, which DCFS recommended due to reported violence during his relationship with Mother. The court also found that Father did not consistently engage in parenting classes, which DCFS recommended due to his "non-existent" bond with G.W. With regard to DCFS's recommendation that Father visit with G.W. in person and via video or telephone, the court noted the following:

"His visits were sporadic, often going months without seeing or speaking with [G.W.] And because he lives in another state, he was recommended to cooperate with interstate compact. He did not do this either. He did not even sign releases of information."

The court noted that, as a result, Father received overall unsatisfactory ratings in all service plans. The court acknowledged that Father maintained consistent employment and made efforts to bond with G.W. during visits but concluded that "he did not do any of the things that would lead to reunification." Thus, the court found the State proved by clear and convincing evidence that Father failed to make reasonable progress towards reunification.[7]

¶ 64    Second, the circuit court found that the State met its burden of proving that Father failed to maintain a reasonable degree of interest, concern, or responsibility for G.W. The court found that Father "rarely and sporadically" visited or contacted G.W. and, thus, he did not establish a bond necessary for reunification. The court acknowledged that Father lived in another state. However, Father made no regular attempts to contact G.W. by phone and did not request gas cards that would have assisted him in driving to Illinois. The court further noted that Father failed to comply with the recommendations in his service plan and refused to participate in the interstate compact process, which "could have paved a path for [G.W.] from Illinois to Wisconsin." Based on Father's

---

[7]The circuit court does not specify a time period in its written order, but we presume the court found Father failed to make reasonable progress during the time period alleged in the State's petition (September 20, 2019, to June 20, 2020).

inconsistent, sporadic visits and his failure to comply with the recommendations in the service plan, the court concluded that the State met its burden of proving by clear and convincing evidence that Father failed to maintain a reasonable degree of interest, concern, or responsibility for G.W. Consequently, the court found that the State proved Father unfit.

¶ 65     On February 22, 2022, following a best interest hearing, the circuit court entered an order finding it in the best interests of both G.W. and Z.M. to terminate Mother and Father's parental rights. Both Mother and Father filed timely notices of appeal. This court subsequently granted the State's motion to consolidate Mother and Father's respective appeals.

¶ 66                                             II. Analysis

¶ 67     On appeal, both Mother and Father challenge the circuit court's judgments terminating their respective parental rights to G.W. and Z.M., arguing that the State failed to prove them unfit by clear and convincing evidence.[8] Before addressing the specific arguments raised in their respective briefs, we find it useful to set forth the legal framework guiding our analysis.

¶ 68     The Juvenile Court Act establishes a two-step process for the involuntary termination of parental rights. See 705 ILCS 405/2-29(2) (West 2020). First, the State must prove, by clear and convincing evidence, that the parent is an unfit person as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Section 1(D) sets forth multiple grounds "under which a parent may be found unfit, any of which standing alone may support" a finding of unfitness. *Id.* If the circuit court finds the parent unfit under one of the enumerated grounds, the court must then determine whether it is the child's best interest that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2020).

---

[8]Neither party challenges the circuit court's determination that it was in the children's best interest to terminate their respective parental rights. Thus, we will not consider the court's determination on that issue on appeal.

29

¶ 69 A reviewing court will not disturb the circuit court's determination on the issue of unfitness unless such determination is contrary to the manifest weight of the evidence. *Tiffany M.*, 353 Ill. App. 3d at 890. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). With this in mind, we turn to the arguments raised in Mother and Father's respective briefs.

¶ 70                                      A. Mother's Appeals

¶ 71 Mother argues that the circuit court erred by finding her an unfit parent because (1) the doctrine of *res judicata* barred the State from presenting the same evidence presented on the State's initial petition to terminate parental rights, (2) the State failed to prove that she failed to make reasonable progress during the specified nine-month period, and (3) the State failed to prove that she failed to make reasonable efforts to return the minor child during the specified nine-month period. We disagree.

¶ 72    1. *Res Judicata*

¶ 73 Mother initially argues that the doctrine of *res judicata* "prevented" the State from reintroducing the testimony of three individuals during the hearing on the second petition to terminate where the testimony could have been presented at the hearing on the first petition to terminate. The State first responds that Mother forfeited review of this issue by failing to fully develop her argument. We agree with the State.

¶ 74    " 'The doctrine of *res judicata* provides that a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action.' " *In re J'America B.*, 346 Ill. App. 3d 1034, 1041 (2004) (quoting

30

*Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389 (2001)). "For the doctrine of *res judicata* to apply, the following three requirements must be satisfied: (1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of causes of action; and (3) an identity of parties or their privies." *Id.* at 1041-42 (citing *Nowak*, 197 Ill. 2d at 390). However, exceptions to the application of *res judicata* exist. *Id.* at 1042 (citing *Terry v. Watts Copy Systems, Inc.*, 329 Ill. App. 3d 382, 387 (2002)). The doctrine will not be applied where it would be fundamentally unfair to do so. *Id.* (citing *Nowak*, 197 Ill. 2d at 390). The applicability of the doctrine of *res judicata* presents a question of law. *Id.* at 1041.

¶ 75    Here, as the State correctly notes, Mother failed to fully develop this argument by explaining how the three requirements for *res judicata* were met in the present case. See *Marsh v. Sandstone North, LLC*, 2020 IL App (4th) 190314, ¶ 49 (finding argument forfeited and declining to consider it where the brief contained only a conclusory statement of error with no legal analysis of the issue). Thus, we agree with the State that Mother forfeited this argument.

¶ 76    Forfeiture aside, we find it unnecessary to reach the merits of Mother's *res judicata* argument. Mother's argument in this regard pertains to the testimonial evidence the State presented in support of its allegation that Mother was unfit on the ground that she was unable to discharge her parental responsibilities to due mental illness. See 750 ILCS 50/1(D)(p) (West 2020). Specifically, Mother's attorney objected to the testimonies of Dr. Tompkins, Dr. Bidiuc, and Officer Hinkel, arguing that such evidence could have been presented in support of the same allegation in the State's first petition to terminate. We acknowledge that the circuit court rejected Mother's argument and considered the testimony in finding Mother unfit on the ground that she was unable to discharge her parental responsibilities due to mental illness. However, we note that the court found Mother unfit on two additional grounds alleged in the second petition to

31

terminate—failure to make reasonable progress (*id*. § 1(D)(m)(i)) and failure to make reasonable efforts (*id*. § 1(D)(m)(ii)) from September 20, 2019, to June 20, 2020. Because a parent may be found unfit if the State proves only one alleged ground of unfitness by clear and convincing evidence, we need not address Mother's *res judicata* argument if we determine that the court's finding on one of the other two alleged grounds was not against the manifest weight of the evidence. See *Tiffany M.*, 353 Ill. App. 3d at 891 ("When parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court."). Thus, we next consider whether the court's finding that the State proved, by clear and convincing evidence, that Mother failed to make reasonable progress during the nine-month period was against the manifest weight of the evidence.

¶ 77    2. Reasonable Progress

¶ 78    Mother argues that the circuit court erred by finding the State proved, by clear and convincing evidence, that she failed to make reasonable progress during the nine-month period alleged in the petition. The State responds that the court's finding that Mother was unfit due to failure to demonstrate reasonable progress was not against the manifest weight of the evidence. We agree with the State.

¶ 79    Section 1(D) of the Adoption Act sets forth the grounds for unfitness. 750 ILCS 50/1(D) (West 2020). One such ground is the failure by a parent "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act." *Id.* § 1(D)(m)(ii). "Reasonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect under the

32

circumstances." (Emphasis omitted.) *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). Reasonable progress requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). Although DCFS service plans are an integral part of the statutory scheme, our supreme court has rejected the view that the sole measurement of parental progress is the parent's compliance with service plans. *In re C.N.*, 196 Ill. 2d 181, 214-15 (2001). Instead, the supreme court ruled that:

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id.* at 216-17.

¶ 80    Here, the State presented evidence, specifically the testimony of Schuler, showing that Mother failed to comply with the service plan from September 20, 2019, to June 20, 2020. Specifically, Schuler's testimony demonstrated that Mother intermittently attended mental health counseling, and that she refused some of the recommended services entirely during that time period. As the court correctly noted, no evidence demonstrated that mother suffered from an intellectual disability or was otherwise hindered by specific obstacles, including the COVID-19 pandemic, that prevented her from attending counseling appointments to change her behavior and assist her in recovering from any lasting trauma.

¶ 81    In addition, the evidence showed that Mother missed over half of her scheduled visits with G.W. and Z.M. from September 20, 2019, to June 20, 2020. The testimonies of McConnaughay

and Schuler showed Mother exhibited erratic and inappropriate behavior that negatively affected the children when she did appear for visits. The evidence additionally demonstrated that Mother received overall unsatisfactory ratings in the service plans during the relevant time period from September 20, 2019, to June 20, 2020. Thus, this court cannot say the court's finding that Mother failed to make reasonable progress during the specified nine-month period was against the manifest weight of the evidence.

¶ 82    We find Mother's argument that the circuit court failed to consider her past trauma unpersuasive. A review of the court's order shows that the court, indeed, considered Mother's past experiences with DCFS in rendering its decision. Despite this, the court concluded that Mother was unable to complete the services necessary to reunite with her children. It was within the province of the circuit court to weigh the evidence and determine the credibility of the witnesses, and this court will not substitute its judgment for that of the circuit court on such matters. See *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010) ("Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a circuit court's finding of unfitness only where it is against the manifest weight of the evidence.").

¶ 83    Because a parent may be found unfit if the State proves only one alleged ground of unfitness by clear and convincing evidence, we need not address Mother's argument that the circuit court erred by finding she failed to make reasonable efforts. See *Tiffany M.*, 353 Ill. App. 3d at 891 ("When parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court."). Therefore, we conclude that the circuit court's determination that the State presented clear and convincing evidence that Mother was an unfit parent was not contrary to the manifest weight of the evidence.

34

¶ 84                                B. Father's Appeal

¶ 85    On appeal, Father argues that the circuit court's order terminating his parental rights must be reversed because the State failed to prove, by clear and convincing evidence, that he was unfit for (1) failing to make reasonable progress toward reunification and (2) failing to maintain a reasonable degree of interest, concern, or responsibility for the minor child. The State responds that the circuit court's findings were not against the manifest weight of the evidence. We agree with the State.

¶ 86    We first address Father's argument that the State failed to prove him unfit for failing to make reasonable progress toward reunification. As set forth above, "[r]easonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances." (Emphasis omitted.) *C.M.*, 305 Ill. App. 3d at 164. Reasonable progress requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 87    Here, the State presented evidence, specifically the testimony of Schuler, showing that Father failed to comply with the service plan from September 19, 2019, to June 20, 2020. Schuler testified that Father failed to participate in domestic violence and anger management courses recommended in his service plan. The evidence further showed, and Father acknowledges in his brief to this court, that he did not complete the recommended parenting course within the relevant nine-month time period. Father also acknowledges that he did not sign consents for communication between the agency and provider and that he "did not do what was needed for Interstate Compact." Moreover, the evidence showed that Father failed to adhere to the requirement that he present for

35

monthly visits with G.W. during the relevant time-period. The State presented evidence that Father missed multiple visits, which negatively impacted G.W., from September 20, 2019, to June 20, 2020. Thus, we cannot say the circuit court's finding that Father failed to make reasonable progress during the specified nine-month period was against the manifest weight of the evidence.

¶ 88    We acknowledge Father's argument that his completion of the recommended services and visits during the specified nine-month time period was complicated by the COVID-19 pandemic. However, there was no evidence showing that the recommended domestic violence, anger management, and parenting courses were unavailable during the COVID-19 pandemic. The evidence also showed that Father missed several Zoom visits with G.W. during the COVID-19 pandemic. Father explains that he missed the visits due to the death of his grandmother, but he acknowledges that his grandmother's death is "not offered as an excuse."

¶ 89    Therefore, we conclude the circuit court's determination that the State met its burden of proving, by clear and convincing evidence, Father was unfit for failing to make reasonable progress was not contrary to the manifest weight of the evidence. Because a parent may be found unfit if the State proves only one alleged ground of unfitness by clear and convincing evidence, we need not address Father's argument that the circuit court erred by finding he failed to maintain a reasonable degree of interest, concern, or responsibility. See *Tiffany M.*, 353 Ill. App. 3d at 891 ("When parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court.").

¶ 90                                    III. Conclusion

¶ 91    For the reasons stated, the circuit court's determinations finding Mother and Father unfit were not against the manifest weight of the evidence. Thus, we affirm the judgments of the circuit court of Marion County terminating their respective parental rights.


¶ 92    Affirmed.